# IN THE COURT OF APPEALS OF IOWA

————————————

No. 25-0600
Filed March 11, 2026

————————————

**In re the Marriage of Alisha Frances Wagner and Tyler Russell Wagner**

Upon the Petition of
**Alisha Frances Wagner,**
Petitioner–Appellee,

And Concerning
**Tyler Russell Wagner,**
Respondent–Appellant.

————————————

Appeal from the Iowa District Court for Cass County,
The Honorable Amy Zacharias, Judge.

————————————

## AFFIRMED AS MODIFIED AND REMANDED FOR FURTHER PROCEEDINGS

————————————

P. Shawn McCann of McGinn & McCann, P.L.C., Council Bluffs, attorney for appellant.

Jessica A. Zupp of Zupp & Zupp Law Firm, P.C., Denison, attorney for appellee.

Brenna Bird, Attorney General, and Justin D. Walker, Assistant Attorney General, attorneys for appellee Child Support Services.

————————————

1

Considered without oral argument
by Greer, P.J., and Schumacher and Ahlers, JJ.
Opinion by Greer, P.J.

**GREER, Presiding Judge.**

Tyler Wagner attacks the district court's dissolution of marriage decree on several fronts: (1) the denial of joint physical care of the parties' children that was agreed to as part of a mediated agreement and instead the grant of physical care to Alisha Wagner; (2) the distribution of the marital property and debts; (3) the award of retroactive child support and daycare expenses; and (4) the calculation of child and medical support awarded. Alisha contends the district court's ruling should be affirmed in all respects.[1]

On our de novo review, we affirm the terms of the decree on all fronts except for a few issues. In that vein, we remand the case for a recalculation of child support using Tyler's current hourly wage income. Because the issue was not preserved, we affirm, as modified, the part of the decree imposing a judgment for back temporary child support. We also modify the amount of property settlement awarded to Alisha after making several adjustments to the allocation of assets and debts. Specifically, as to the custody issue, after weighing the best interests of the children, we find the children will be best served under a joint legal custody arrangement with physical care of the children placed with Alisha.

## I. Background Facts and Proceedings.

The parties married in April 2019. After Tyler moved out of the home, in July 2023, Alisha petitioned for a dissolution of marriage. The parties are

---

[1] In the statement related to non-oral submission, Alisha refers to matters that are outside the record in this appeal, which we do not consider in this opinion. We caution counsel to follow our appellate rules. *See* Iowa R. App. P. 6.801 (defining the record on appeal); *State v. Sandifer-Jackson*, No. 23-0961, 2024 WL 1297005, at *3 (Iowa Ct. App. Mar. 27, 2024) (expressly cautioning about and then disregarding attempts to inject outside-the-record facts into our review).

parents to two children.[2]  Following an October temporary-matters hearing that considered only exhibits and affidavits, the district court granted joint legal custody to the parties with physical care to Alisha on a temporary basis. Tyler was granted visitation on alternating weekends from Friday at 5 p.m. to Monday at 8 a.m.  Using wage income of $29,081 for Tyler and $35,702 for Alisha, Tyler was ordered to pay child support of $537.72 per month, plus he was to maintain the health insurance for the children that was currently in place through his employer.  The district court reserved ruling on Alisha's request to share the daycare expenses until the final hearing.

In mid-January 2024, the parties mediated and reached two agreements—one was an asset and debt agreement (mediated agreement) and one was a partial parenting plan (parenting plan).  Related to issues in this appeal, both agreed to use an appraised value of the marital home if it fell between certain parameters, restricted to a December 31, 2023 valuation date as to the assets and debts.  Some asset values were also agreed upon in the mediated agreement.

As to the parenting plan, the parents agreed to joint legal custody of the two children with joint physical care, but the judge would have to determine a schedule for parenting time.  The parenting plan also left other issues related to the care of the children for the court to decide.  Specific terms on selection of school district, holiday visitation, transportation, medical insurance, and communication were part of the written plan.  Each parent acknowledged that, subject to approval by the attorneys, the court should approve and incorporate the terms into the final order.  They also acknowledged the parenting plan was "in the best interests of each of their

_____

[2] Tyler adopted Alisha's older child, born in 2017, and the couple's younger child was born in 2022.

children." But, in November 2024, after a dispute related to mental-health counseling for one child and after reviewing Tyler's medical records, which Alisha alleged established that Tyler ignored medical advice including required emergent treatment, Alisha moved to amend her petition to request sole legal custody.

At trial, various facts were developed for our review. Alisha was thirty-three years old and was employed by an abstract company, with annual earnings of $33,939.70. Tyler was thirty-nine years old and worked for a large retailer. In 2023, he had been making $20 per hour but testified that he changed positions to accommodate a more flexible parenting schedule and was only making $18.54 per hour or $38,695.63 annually at the time of the trial. The parties' 2023 tax return wage attributed annual income of $42,971 to him, but Tyler asserted that number included $14,000 in medical and disability payments related to a kidney transplant he underwent. In the end the district court used Tyler's claimed 2023 income from the tax return and ordered him to pay $757.43 in monthly child support. Alisha had also asked to be reimbursed for sixty-five percent of the daycare expenses she had incurred since the filing of the petition, and the court ordered Tyler to pay one-half, totaling $5,900.34. Alisha also asked for retroactive temporary support because she claimed Tyler understated his income, and the court also required Tyler to pay $2,416.81 in retroactive temporary child support.

A central issue in the custody dispute was Tyler's health condition. Tyler has been a diabetic since he was a child, but according to the testimony at trial, his health condition deteriorated in late 2021 causing him to go on hemodialysis, a form of dialysis. Ultimately, his health condition led to his kidney transplant in November 2022. Tyler testified that in his October 2024 follow-up visit, he learned he might require dialysis in the future but for the

present he could work and parent without restrictions. As part of the record, Alisha produced a large set of Tyler's medical records that reflected health issues of dizziness, extensive bouts of diarrhea, and continuing infections leading up to the trial. The records also showed that Tyler ignored medical advice, even when the health event appeared to be serious. Tyler acknowledged that he likely will require dialysis and another kidney transplant in the near future.

During the course of the marriage, the record established that Alisha served as the primary caretaker of the children, taking them to appointments, managing their schedules, and handling the day-to-day care required for them to thrive. Tyler was also involved but to a lesser degree as his health situation made him tired and often his treatment required him to be gone—either for a day at a time or in late 2022 through early 2023, for months. Both parties agreed that surrounding the time of the transplant, Alisha had taken on the majority of the children's care. Since the parties separated, Tyler asserted he was managing work and the children well and had the support of his live-in paramour and his father, who could watch the children on Fridays.

Although the parties had a mediated agreement dividing some of the assets and debts, the parties addressed several unresolved property issues. One issue related to the valuation of the marital home and how to handle the non-marital contribution to the marital home and the downpayment gift from Tyler's parents. It was agreed that Alisha would retain the home. Tyler's parents gave Alisha a down payment of $13,000 to apply to the marital home purchase. And Alisha applied $7,750 in premarital monies from the sale of her previous home towards the purchase of the marital home. As for the home valuation, the district court accepted Alisha's estimate of $144,000 as

the value of the home although the appraiser agreed upon by the parties opined it had a value of $169,000. Alisha alleged Tyler dissipated funds.

After hearing the evidence over two days in October and November 2024, the district court determined the parties should have joint legal custody of the children, with physical care placed with Alisha. The court set out a schedule dividing the assets and debts after considering the parties' evidence related to reimbursement payments, dissipation of funds, and disputed values. Tyler was ordered to pay $500 of Alisha's attorney fees.

Tyler's motion to reconsider the decree was denied with the district court noting it had made "significant credibility findings" that impacted its decision. As for Alisha's motion to reconsider, the court modified the property division by ordering Tyler to pay a larger cash equalization payment because of an additional credit Alisha requested. The amended final decree required Tyler to pay an equalization payment of $13,248.73.[3] Tyler appeals from these rulings.

## II. Standard of Review.

We review dissolution proceedings de novo, giving weight to the factual findings of the district court, though they are not binding on us. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 484 (Iowa 2012). On our review, "we examine the entire record and adjudicate anew the issue of the property distribution." *In re Marriage of Towne*, 966 N.W.2d 668, 674 (Iowa Ct. App. 2021) (citation omitted).

---

[3] Because the district court included on Alisha's side of the property ledger a bank account containing gifted funds, the court added an additional $2,156.38 to the net total of $11,092.35 that the court originally determined Tyler owed Alisha.

### III. Analysis.

**A. Joint Legal Custody and Physical Care.** Tyler contends that he should have been granted joint legal custody with joint physical care of the children like the parties agreed at the pretrial mediation and that the court overemphasized his health conditions in its custody determination. The district court rejected Alisha's request for sole custody and Tyler's request for joint legal custody and physical care, landing instead on an award of joint custody with physical care placed with Alisha. Tyler asserts that if the district court had correctly considered his current ability to parent, it would have awarded joint legal custody with joint physical care between him and Alisha so that they could alternate parenting time on a week-on/week-off basis. Alisha contends that the court need not blindly approve the parenting agreement but must decide that the custodial determination is in the best interests of the children and it did so here. And even though the parties agreed to some components of the custody arrangement, the agreement left specific terms open for the court to decide, acknowledging they were unable to agree on how the joint physical care custody plan would even work. Alisha testified she did not agree to a fifty-fifty joint physical care schedule at the mediation because she would need to see Tyler be more involved.

Because the January 2024 mediation conference was held before she received Tyler's medical records in October, Alisha contends his current health condition legitimately changed her view on his ability to care for the children. In her motion to amend to request sole legal custody, she asserted:

> [Tyler] has a history of threatening to terminate reasonably necessary medical services when he is angry. He threatened Mayo in the same way as Exhibit 49 shows. On 11/30/23, when Mayo wanted Tyler to go be admitted to the emergency room due to concerning lab testing results he threatened to "discontinue care through mayo permanently" because he was "not happy" with the doctors' advice and recommendations. . . . He

threatened the same thing again a few weeks later on December 14, 2023, even when doctors literally told him he could *die* if he did not go to the ER, but he still refused.

. . . .

However, now that Tyler is unilaterally violating [Alisha's] joint legal custodial rights *and* harming the child in the process, and given his history of disagreeing with doctors and ignoring their advice, Alisha has practically no choice *but to* seek an award of sole legal custody which she recognizes is an extreme, but sometimes necessary, remedy. *In re Marriage of Frazier*, 1 N.W.3d 775 (Iowa 2024) (discussing how the district court cannot render tie-breaking decisions when two joint legal custodians disagree).

She also argues that other factors support the district court's decision, including Tyler's lack of continuity of caregiving and the parties' inability to communicate.

We do not find that the partial parenting plan agreed to at the mediation stage is binding on the district court, but it is one of many factors to consider. *See In re Marriage of Jones*, 653 N.W.2d 589, 594 (Iowa 2002) (confirming that an agreement between parents will not be incorporated into a decree if the court finds the terms will adversely affect the best interests of the children). This policy is borne out by how our legislature set out standards and rules for mediation in dissolution of marriage actions. *See* Iowa Code § 598.7 (2023). Specifically, the statute states the "mediation agreement reached by the parties shall not be enforceable until approved by the court." *Id.* § 598.7(4)(d). So, we turn to a consideration of the factors driving the custody determination and what arrangement is in the best interests of the children.

When the court awards joint legal custody to the parents, the court may award joint physical care or physical care to one parent. Iowa Code

9

§ 598.41(5)(a); *In re Marriage of Hansen*, 733 N.W.2d 683, 695–96 (Iowa 2007). Our primary concern is the best interests of the children and thus, we consider a multitude of factors, including those found in Iowa Code section 598.41(3)[4] and those outlined in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). If "both parents are suitable caregivers" the court will consider four main factors to determine "whether joint physical care will be in the children's best interests": "(1) stability and continuity of caregiving; (2) the ability of [the parents] to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) the degree to

---

[4] Some of the factors set forth in Iowa Code section 598.41(3) include:

> a. Whether each parent would be a suitable custodian for the child.
>
> b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
>
> c. Whether the parents can communicate with each other regarding the child's needs.
>
> d. Whether both parents have actively cared for the child before and since the separation.
>
> e. Whether each parent can support the other parent's relationship with the child.
>
> . . . .
>
> g. Whether one or both of the parents agree or are opposed to joint custody.
>
> h. The geographic proximity of the parents.
>
> i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.

Iowa Code § 598.41(3)(a)–(e), (g)–(i).

which parents are in general agreement about their approach to daily matters." *In re Marriage of Geary & Haynes*, No. 10-1964, 2011 WL 2112479, at *2 (Iowa Ct. App. May 25, 2011) (citing *Hansen*, 733 N.W.2d at 696–99). If we determine that joint physical care is not in the children's best interests, then we consider "which caregiver should be awarded physical care" and "the factors of continuity, stability, and approximation are entitled to considerable weight." *Hansen*, 733 N.W.2d. at 700.

Much of the trial addressed Tyler's medical condition and whether he could physically handle a parenting role. The district court addressed the health issue by noting that it:

> could write pages about the way Tyler has managed his health and whether he has been completely honest with Alisha about his prognosis. He clearly has not. Tyler did not inform Alisha about most of his current medical issues until discovery was sought so Alisha could understand the present situation. In fact, Tyler appears to have been trying to hide the fact that he will likely be on dialysis soon in order to have a joint custody order entered.

The district court pointed to Tyler's refusal in fall of 2023 to follow advice from Mayo Clinic staff because "he will lose custody of his kids if he goes to [the] hospital and is admitted." But, to rebut the notion his health is a factor, Tyler produced two exhibits where his medical care providers both opined that Tyler's condition in October 2023 and 2024 would not impact his ability to parent. In one report the doctor stated, "I think he is still functionally active, without any uremic symptomatology and his worsening renal function is not an impediment to him taking care of his children." The other exhibit was a letter from a Mayo Clinic doctor who opined that "Tyler's transplant presents no apparent medical barriers to his performing duties as a parent at this time or is anticipated, based on his medical condition and prognosis, at any time in the future." Thus, Tyler asserts any claim that his condition would inhibit his ability to care for the children is wholly speculative.

Tyler's medical condition, in and of itself, is not determinative of his parenting abilities as people with serious medical conditions can manage parenting responsibilities despite their diagnosis. From our vantage point, continuity, stability of care, and communication are the primary factors that stand in the way of a joint physical care award under these facts. Tyler's health concerns and his communication about those conditions factor into the review of who has provided continuity of care and how the parties are able to communicate to support the best interests of the children.

Starting with continuity of caregiving, which along with stability is one of the primary factors to consider, we note Tyler provided minimal evidence of his involvement with the basic care of the children, both pre- and post-separation. *Id.* at 696. And while Tyler talks about fairness in how custody should play out, "[p]hysical care issues are not to be resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*." *Id.* at 695. Alisha testified that she was the parent primarily handling the day-to-day functions of raising the children, including going to and setting appointments, changing diapers, staying with the children when they were sick, and attending their events with little assistance from Tyler.

Pre-separation, Tyler's caregiving capacity was limited by his health. Alisha observed that his hemodialysis left Tyler extremely tired and took time away from the children, sometimes he could not even drive. His treatment then changed to peritoneal dialysis where he was required to be connected to a machine overnight. Eventually Tyler was selected for kidney and pancreas transplants and underwent the procedure in November 2022, returning home in March 2023, with no visits with the children during those months. At this point, their youngest child was only a few months old and Tyler could not help care for the newborn. Alisha testified that he had never had a single

night alone parenting a child while living with her. She testified that Tyler moved to sleep in a bedroom in the basement and often detached from the family for hours, even locking the door to his room. Alisha described a time when she could not get Tyler, who was locked in his room, to answer so she called her mother to help with the children. Alisha characterized his detachment from the family as worse after the transplant procedure.

Even after the October 2023 temporary-visitation order, Tyler's visitation was minimal and he did not ask for overnights or any other extra parenting time. Even after the mediation, Tyler did not ask for the ten days of summer visitation he negotiated in the parenting plan. Tyler did not attend medical or counseling appointments and was not actively involved in other day-to-day caregiving or the older child's activities. Alisha was optimistic at the mediation session that Tyler might have a greater role until she viewed the medical records that showed he might again go through the transplant process and that he was again having other serious difficulties. And although Tyler indicated he was functioning without any issues, outside of his regular days off, his work record for the month before trial showed Tyler did not work for twenty-one days of September. Yet Tyler downplayed and failed to communicate difficulties that might affect his care of the children. The district court pointed to Tyler's contention that although his recent health condition caused him to "live[] on the toilet," he could still care for the children by just placing them in the bathroom with him.

We find that the factor of continuity of caregiving and stability weighs in favor of not awarding joint physical care as Tyler—both pre- and post-separation—has not provided the level of involvement that he requests.

And other factors support the decision that joint physical care is not in the best interests of the children. Those factors include the parties' ability to

communicate, degree of conflict between them, and the extent of agreement related to daily childcare matters. These factors also cut strongly against a joint physical care award. Behaviors that include power struggles, hostility, or a domineering attitude are not conducive to co-parenting. *Id.* at 698.

Tyler demonstrated behaviors that do not bode well for a joint physical care arrangement. His medical records reflected his irritation with his providers, such that he even hung up on them during calls. That hostile behavior also entered his interactions with the older child's therapist. Without notice to Alisha, Tyler unilaterally cancelled the child's therapy because he was angry when the therapist opined that the child was "worrying about custody" and "doesn't care for the 50/50."

According to Tyler, he believed the daycare provider and school personnel did not support him. And his irritation and anger impacted his parenting decisions in an immature way. Although he planned to help the older child with a fair 4-H project, Tyler became angry and refused to participate because he felt Alisha was taking it over by changing the recipe to make the preparation time fit with the time allowed. He inappropriately messaged the child "heard you didn't want to do pudding the way we have been practicing. so I'm taking myself out. You'll need to practice with mom. I wanted it to be a me and you thing." He also messaged Alisha, "Since it's your project. Go ahead and provide everything. I will not be involved. Good for you for pushing me out. [clapping emoji]." Later, when he had care of the child, he refused to take her a block to go to the 4-H meeting and made Alisha come take her.

When Alisha tried to communicate a bedtime schedule Tyler messaged her that she had "overextended your parenting into my house." The two tried to resolve an issue over a watch the child could not wear at

Tyler's home, because he thought it might be able to spy on them. He pushed back on the choice of therapist but made no suggestion for a replacement. Parents who disagree "on child rearing issues" have a higher "likelihood that ongoing bitterness will create a situation in which children are at risk of becoming pawns in continued post-dissolution marital strife." *Id.* at 699.

To navigate a joint physical care schedule, parents must be honest with each other and show each other mutual respect. *Id.* at 698. When Alisha attempted to discuss Tyler's medical condition and the care of the children, he messaged her that "You have no business in my personal life." Alisha tried to encourage use of a parenting communication app, and Tyler messaged back "I am not going to install an app when I almost never have her." Tyler testified that he and Alisha have two different households, which he interpreted to mean that "she doesn't get to say what happens in my household, and I don't get to say what happens in hers. Should they be close? Yes. But they are not exact." And as he instructed Alisha "I will do things my way for the kids' best interest, and it will not be your way." We observe that a smooth, working relationship is a prerequisite to a successful joint physical care arrangement *Id.* at 701. Here, Tyler's inability to honestly communicate with respect stands in the way of successful co-parenting.

In our view, the decision to deny joint physical care was not primarily based on Tyler's health condition, but a constellation of factors. Given that our objective related to "a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity," we find placing the children in joint custody of the parties and in the physical care of Alisha best achieves that goal. *See id.* at 695. We affirm the district court's determination on this custody issue.

**B. Child Support.** Next, Tyler argues that the district court applied the child support guidelines using an incorrect annual income for him. The district court opted to use $42,971 in income as reported in the parties' 2023 income tax returns, which Tyler claims showed inflated income in the amount of $14,000. He contends that sum represented money paid towards disability payments related to his transplant surgery and recovery costs. He points to the returns from the previous three years and notes that Alisha consistently made more income than he did, so the 2023 tax return is an anomaly.

Tyler maintains that if actual earned income is considered, the 2023 tax return reflected that he only made $28,971. He argues that if his current wage earnings of $18.54 per hour for a forty-hour work week are considered, he earns $38,695.63. Alisha asserts that Tyler took a voluntary demotion in September 2024, his work records that month showed he did not work for twenty-one days, and he did not produce paystubs for October or November that year, making his actual income unclear. Plus, she points to his filed affidavit of financial status, which stated it was a complete statement of assets and liabilities as of December 31, 2023, where Tyler showed earnings of $41,600, and it noted the source of income was $20 per hour per mediation stipulation." Additionally, Alisha contends that although the 2023 tax return included short-term disability income, had he not been disabled, his actual earnings would have been greater in any event. The district court determined that "given the contradictory testimony and exhibits provided by" Tyler the best evidence available to establish his income was the 2023 tax return.

"The court must determine the parent's current monthly income from the most reliable evidence presented." *In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991). This is not a situation where Tyler's income

fluctuated or he was self-employed making it difficult to calculate the earnings. *See In re Marriage of Cossel*, 487 N.W.2d 679, 681 (Iowa Ct. App. 1992) (averaging income using several years of tax returns to help reflect actual earnings when a person had wide fluctuations in income). Tyler is a wage earner, and his wage statements were part of the record we reviewed. Tyler offered a wage statement for the period September 7 through September 20, 2024, which reflected a change in Tyler's rate of pay to $18.54 per hour. He testified his new position, which allowed more flexibility with the children, came with a reduction in his hourly income from the previous $20 per hour rate. Using the last-known wage income on the wage statement presented at trial, we find Tyler's annual income would calculate to the $38,695.63 annual income Tyler advocated be used for child support purposes. We find this to be more compelling evidence than a tax return that included short-term disability income.

Tyler asks that we remand the case for a recalculation of child support. We agree with this request and remand to the district court for a calculation using wage earnings of $38,695.63 for Tyler and $33,939.70 for Alisha, retroactive to the date of the decree.

**C. Property Division.** For the most part, the parties agree on how the district court divided the assets and debts. But Tyler challenges several parts of the district court's distribution of assets and debts. We address them in these categories: (1) application of the mediated asset and debt agreement; (2) treatment of premarital property and gifts in the division; (3) valuation of the marital home; (4) allocation of disproportionate financial burdens to Tyler; and (5) dissipation of assets. To address these issues, we consider that under section 598.21(5), an equitable distribution of marital property does not require an equal division of assets. "Equality is, however, often most

17

equitable; therefore, we have repeatedly insisted upon the equal or nearly equal division of marital assets." *See In re Marriage of McDermott*, 827 N.W.2d 671, 682 (Iowa 2013).

1. *Application of mediated agreement.* To be fair to the process, we consider that the parties entered an agreement on how property and debts would be divided. The mediated agreement provided that the "valuation day" for all assets and debts would be December 31, 2023. Trial was not held until the fall of 2024. That mediated agreement can be considered by the district court in formulating the property division. Iowa Code section 598.21(5)(k) provides that the district court shall consider "[a]ny written agreement made by the parties concerning property distribution." But just as the district court could disregard the mediated agreement as to child custody, it also can reject the parties' pre-trial agreement as to property. As to a pre-trial property division agreement, the court has the authority to reject a stipulation if it is unfair or contrary to law. *In re Marriage of McCreedy*, No. 11-1835, 2012 WL 3196033, at *3 (Iowa Ct. App. Aug. 8, 2012) ("The court is not bound by the parties' agreement as to how their property should be distributed."). Interestingly both parties want some parts of the mediated agreement to be enforced and others not. So we examine the issues raised by Tyler related to the property division with an eye towards the terms they agreed to that are fair and not contrary to law.

2. *Treatment of premarital property and gifts.* When the parties purchased the marital home, Tyler's parents gave Alisha $13,000 to apply to the purchase and Alisha contributed $7,750 of funds she had from her pre-marital sale of her home. The district court gave each party credit for one-

half of the parent's gift in the division of assets but offset Alisha's non-marital contribution to her, noting it was a short-term marriage.[5]

Tyler asserts that the district court should have set aside the $13,000 gift for the home purchase from his parents to Alisha as his gift solely. He argues, rather than giving Alisha full credit for her $7,750 premarital contribution to the home purchase, the court should apply it as a "wash" with his $13,000 gift and apply no credits against the home value. He also asserts the court disregarded the mediated agreement on this issue. But we find the mediated agreement does not expressly address how these sums should be treated and in fact noted that as to the parents' gift the parties disputed "whether equity demands credit to either party . . . and if so, how much credit."

Iowa Code section 598.21(5) requires "all property, except inherited property or gifts received or expected by one party," to be equitably divided between the parties. Thus, we generally include in the property to be divided "not only property acquired during the marriage by one or both of the parties, but property owned prior to the marriage by a party." *In re Marriage of Hansen*, 886 N.W.2d 868, 872 (Iowa Ct. App. 2016) (citation omitted). As part of the property division determination, property brought to the marriage by each party is merely one factor among many to be considered under section 598.21. "Other factors include the length of the marriage, contributions of each party to the marriage, the age and health of the parties, each party's earning capacity, and any other factor the court may determine to be relevant to any given case." *In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007); Iowa Code § 598.21(5). Still, "to achieve equity, the

---

[5] The district court's calculations in the decree did not reflect a credit of $7,750 to Alisha, we do so here.

division need not be equal in most short-term marriages. Rather, it is often equitable to simply award the property to the party that brought it into the marriage." *Hansen*, 886 N.W.2d at 873. This is a six-year marriage, with the parties separating after four years. It was not inequitable for Alisha to retain credit for her pre-marital monies.

As for the parents' gift to Alisha, the district court recognized that Tyler's parents would not have given Alisha money for a down payment had she and Tyler not been married. Likewise, the reason the gift was made only to Alisha was that she had the better credit rating at the time and having her purchase the home garnered a better interest rate on the loan. There was no testimony at trial about the donors' intent and, based on the record, it was equitable to split the gift as a credit to each party.

3. *Valuation of marital home.* Tyler obtained an appraisal by a certified residential appraiser who valued the family home awarded to Alisha at $169,000 as of December 31, 2023. The parties bought the home in October 2020 for $125,000. The assessed value for 2024 was $130,090. Alisha provided a list of what she believed were comparable properties in her research at the title company where she worked. Her exhibit listed fourteen other properties, comparing sale price, home square footage, number of bedrooms, and assessed valuation. She estimated the home value at $144,000.

In the mediated agreement, the parties agreed to:

have the property appraised by someone outside of Cass County. They will share in the cost of the appraisal 50/50 but Tyler will pay the travel expense for the appraiser. Both parties agreed the value will be the amount determined by the appraiser. They will be bound by the value, so long as it falls between $130,000 and $157,000. The parties agree that there is a

mortgage for $111,000 and a consumer loan with Service Finance for $13,000 (for the bathroom).

Because the appraisal established a fair market value that exceeded the parameters in the mediated agreement, the parties were not bound to accept it. After its consideration of the evidence, the district court valued the home at $144,000 criticizing the appraisal and finding Alisha's evidence more credible.

"Valuation is difficult and trial courts are given considerable leeway in resolving disputes as to valuations." *In re Marriage of Shanks*, 805 N.W.2d 175, 177 (Iowa Ct. App. 2011). "Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence." *Hansen*, 733 N.W.2d at 703. Even though our review is de novo, we generally "defer to the trial court when valuations are accompanied by supporting credibility findings or corroborating evidence." *Id*. But we still review the evidence de novo and, here, Alisha did provide her comparable sales, but we also have an appraisal from a certified appraiser.

Describing how she arrived at $144,000, Alisha testified that

> Well, kind of meeting in the middle of all the numbers and based on all of the properties, when I have access to stuff, so I can tell that that would be about the price, it would be based on my opinion and [the midway point in the mediation that] we agreed on.

She also testified that the assessed value was $94,850 at the time they paid $125,000 for the house and that the assessed value had increased 40–50% in the last couple years, even though they had not made any major improvements. The district court credited Alisha's report stating that it did not "make sense that the marital home should be *valued higher than larger, more up to date homes*." (Emphasis added.)

21

Several things stand out on our review of Alisha's exhibit and her testimony. First, there was no evidence about how "up to date" the other homes were on the list. Second, two of the homes, with roughly the same square footage of the marital home, had higher sales prices closer in value to that determined under the appraisal report. Finally, another property on the same street as the marital home, roughly the same size, was on the list showing a sales price of $165,000.

Although the appraiser did not testify, her residential appraisal summary report was made part of the record. From that report, we glean that the appraiser inspected the marital property and then compared properties and made value adjustments using nineteen factors including the site square footage, home square footage, age of the structure, and amenities. The appraiser also described the average marketing time in the neighborhood over the last year to be one to two months.

Upon our review of all evidence submitted, we determine that equity requires consideration of both estimates of value and find that splitting the difference at $156,500 would be equitable under this record. That valuation would fit within the confines of the parties' mediated agreement with support from corroborating evidence as to each of the parties' valuations. We modify the decree accordingly.

4. *Allocation of disproportionate financial burdens.* The district court assessed "reimbursements" against Tyler in the property division schedule provided in the body of the decree, and Tyler argues this allocation created a "disproportionate financial burden" on him. The district court required Tyler to reimburse Alisha the sum of $5,900.34, which was one-half of the 2024 daycare expense that Alisha paid, and for back temporary child support

of $2,416.81.[6]  Alisha contended that Tyler underreported his income when temporary support was set and thus, he should have to make up that obligation with back support.[7]  As noted by the district court, the child support worksheet submitted at the temporary hearing was prepared by Alisha and set income for Tyler at $29,081.  Yet, for the temporary support hearing, Tyler filed an affidavit stating he made $21 per hour and was scheduled for forty-hour work weeks.

On this child support issue, Alisha did not preserve her right to retroactive support.  "A temporary order setting child support is a final judgment that is appealable as a matter of right."  *In re Marriage of Curtis*, No. 18-1535, 2019 WL 3729275, at *6 (Iowa Ct. App. Aug. 7, 2019).  She was required to appeal the temporary support order "within 30 days from the district court decision in order to preserve the right to contest [it]."  *In re Marriage of Denly*, 590 N.W.2d 48, 50 (Iowa 1999).  Certainly, Alisha could have moved at the time of the temporary hearing to correct the child support calculation as she did have information about Tyler's earnings from his affidavit, but she did not follow the correct procedure, so we modify the portion of the decree awarding Alisha back child support of $2,416.81.  *Curtis*, 2019 WL 3729275, at *6 (noting the process to correct or modify a final judgment is "upon timely petition and notice under [Iowa Rule of Civil Procedure] 1.1013." (cleaned up)); *see also* Iowa R. Civ. P. 1.1012.

---

[6] Tyler also argued that he should not have to reimburse Alisha for the costs related to obtaining his medical records, but his arguments on this point are meritless.  When asked why if he could access the records online, he made Alisha pay for them, his response was "[b]ecause you're the opposing side."

[7] No one appealed the temporary matters order.

But as for the retroactive reimbursement of the daycare expense, this issue was preserved in the temporary matters order for consideration at the final trial. *See In re Marriage of Nelson*, No. 23-1893, 2025 WL 542816, at \*12 (Iowa Ct. App. Feb. 19, 2025) (assuming without deciding that the district court preserved the issue of child support for the final hearing). Here, the district court specifically stated that it reserved "any decision regarding daycare for the final hearing." We find it equitable to require Tyler to pay one-half of the daycare expense of the children as ordered by the district court in the decree.

5. *Dissipation of assets.* To tee up the consideration of whether assets have been dissipated before dividing the property of the parties, Alisha had the burden to show "(1) whether the alleged purpose of the expenditure is supported by the evidence, and if so, (2) whether that purpose amounts to dissipation under the circumstances." *Fennelly*, 737 N.W.2d at 104 (quoting Lee R. Russ, *Spouse's Dissipation of Marital Assets Prior to Divorce as Factor in Divorce Court's Determination of Property Division*, 41 A.L.R.4th 416, 421 (1985)). A court can consider if the payment of the obligation was reasonable and expected in that particular marriage. *Id.* at 105.

Tyler's bank records and credit card statements showed that he spent $956.70 and $736.50 on online gaming and entertainment. He argues these expenses were modest and occurred after the parties separated. Tyler maintains that the court should not have treated these amounts as "one-sided dissipation." Given the timing and amount of the expenditures, we find it was inequitable to characterize them as dissipated assets of the marriage. We do not find that Alisha proved Tyler's "behavior [rose] to the level of ill will or inappropriate conduct sufficient to justify variance" in the property division. *Fennelly*, 737 N.W.2d at 104.

Therefore, we remove these expended amounts as assigned assets in the calculation of the equalization payment due.

6. *Readjustment of equalization payment.* Making the above-described adjustments rounded to the nearest dollar, results in this distribution:

| Item | Description of Asset/Debt | Tyler | Alisha |
|---|---|---|---|
| 1 | House | | $156,500 |
| 2 | House mortgage | | ($110,286) |
| 3 | House second mortgage | | ($13,887) |
| 4 | 2015 Ford Fusion | $13,001 | |
| 5 | 2015 Ford Fusion debt | ($13,000) | |
| 6 | 2017 Jeep Cherokee | | $11,600 |
| 7 | 2017 Jeep Cherokee debt | | ($18,357) |
| 8 | Wells Fargo account | $798 | |
| 9 | Rolling Hills account ***3 | | $3,282 |
| 10 | Rolling Hills account ***6 | | Gift |
| 11 | Tyler 401(k) | $8,175 | |
| 12 | Walmart Stock | $1,880 | |
| 13 | Alisha 401(k) | | $3,545 |
| 14 | Wells Fargo credit card | ($4,968) | |
| 15 | Household contents | | $1,000 |
| 16 | Premarital funds contributed to house | | ($7,750) |
| 17 | Gift from Tyler's parents | ($6,500) | ($6,500) |
| 18 | Post-separation household items | $4,581 | |

| 19 | Additional post-separation household items | $564 | |
|---|---|---|---|
| | **Total** | **$4,531** | **$19,147** |
| | Payment Needed to Equalize Net Worth | $7,308 | ($7,308) |
| | Total After Equalization Payment | $11,839 | $11,839 |

As shown on this recapitulation table, Alisha would owe an equalization payment of $7,308 to equalize the marital net worth each party receives. But from that figure, the district court required deductions for Tyler's obligation to Alisha for $5,900 of daycare expenses, $500 of trial attorney fees, and $1,138 for medical record costs. After deducting those amounts, Tyler owes a property equalization payment to Alisha of $230.

We modify the decree to modify Tyler's obligation to pay Alisha a property settlement obligation and require Tyler to pay Alisha a property settlement in the amount of $230. This modification extinguishes the judgment against Tyler for trial attorney fees. This amount also extinguishes Tyler's payment for past daycare expenses and medical record costs. Tyler shall pay Alisha $230 within thirty days of issuance of procedendo.

**D. Appellate Attorney Fees.** Alisha requests an award of appellate attorney fees of $10,636.23. An award of appellate attorney fees rests in the court's discretion after consideration of "the needs of the party seeking the award, the ability of the other party to pay, and the . . . merits of the appeal." *McDermott*, 827 N.W.2d at 687 (citation omitted). Tyler and Alisha have similar wage income and Tyler had some success with his challenge to the decree, so we decline to award appellate attorney fees to Alisha.

26

**IV. Conclusion.**

On our de novo review, we affirm the terms of the decree of dissolution of marriage, except that we remand the case for a new calculation of child support using the parties' most current wage income as described above. We find modification of the temporary child support was not properly before the court and modify the portion of the decree that reimbursed Alisha for back child support. We modify the marital home valuation and because of those modifications to the decree and others as set out above, we order Tyler to pay Alisha the sum of $230. We decline to award Alisha appellate attorney fees.

**AFFIRMED AS MODIFIED AND REMANDED FOR FURTHER PROCEEDINGS**.